UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MIKALA J. WILKERSON, o/b/o <br> S.R.W., a minor, <br><br> Plaintiff, <br><br> v. <br><br> MARTIN O'MALLEY, <br>   Commissioner of the <br>   Social Security Administration, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. CIV-23-175-AMG<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **MEMORANDUM OPINION AND ORDER**

Mikala J. Wilkerson ("Plaintiff") brings this action on behalf of S.R.W. ("Claimant" and minor child) pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. (Doc. 1).[1] The Commissioner has filed the Administrative Record ("AR") (Doc. 5), and the parties have fully briefed the issues. (Docs. 11, 17, 18). The parties have consented to proceed before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Docs. 9, 10). Based on the court's review of the record and the issues presented, the court **REVERSES** Defendant Commissioner's decision, and the case is **REMANDED** for further consideration consistent with this order.

---

[1] Citations to the parties' briefs refer to the court's CM/ECF pagination. Citations to the Administrative Record refer to its original pagination.

1

I.   **Procedural History**

Claimant protectively filed an application for SSI on March 12, 2020, alleging a disability onset date of June 1, 2019. (AR, at 15, 181-82). Plaintiff later amended the onset date to the date of the application. (*Id.* at 49). The SSA denied the application initially and on reconsideration. (*Id.* at 69, 71-84, 85, 87-102). An administrative hearing was held on May 16, 2022. (*Id.* at 43-68). Afterwards, the Administrative Law Judge ("ALJ") issued a decision finding Plaintiff was not disabled. (*Id.* at 12-31). The Appeals Council subsequently denied Plaintiff's request for review. (*Id.* at 4-6). Thus, the ALJ's decision became the final decision of the Commissioner. *Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009); 20 C.F.R. § 404.981.

II.  **Administrative Decision**

At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 12, 2020, the application date. (AR, at 18). At Step Two, the ALJ found Plaintiff had the following severe impairments: chromosome disorder 16P11.2, speech and language impairment, borderline intellectual functioning, and adjustment disorder. (*Id.*) At Step Three, the ALJ found Plaintiff's impairments, considered singularly or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (*Id.* at 19, 20). In conducting this analysis, the ALJ assessed Claimant's functioning in six domains, as follows: (1) "less than marked limitation in acquiring and using information," (*id.* at 25); (2) "less than marked limitation in attending and completing tasks," (*id.* at 26); (3) "less than marked limitation in interacting and relating with others," (*id.* at 27); (4) "no limitation

2

in moving about and manipulating objects," (*id.* at 28); (5) "less than marked limitation in the ability to care for herself," (*id.* at 29); and (6) "less than marked limitation in health and physical well-being," (*id.* at 30). Based on these findings, the ALJ found Claimant had not been under a disability since March 12, 2020. (*Id*. at 31).

**III.     Claims Presented for Judicial Review**

While Plaintiff's arguments are repetitive and difficult to discern, she functionally raises four points of error. First, Plaintiff asserts the ALJ failed to adequately explain how persuasive she found the state agency reviewers' opinions. (Doc. 11, at 4, 6, 10, 12, 13, 15). Second, Plaintiff contends the agency reviewers' opinions are neither consistent with nor supported by the record regarding each functional domain. (*Id.* at 6-7, 8-9, 10-11, 13, 14-15). Thus, Plaintiff argues that to the extent the ALJ found these opinions persuasive, the decision is not supported by substantial evidence. (*Id.*) Third, Plaintiff argues the ALJ erred at step two by failing to explain why Claimant's speech disorder did not meet Listing 102.00. (*Id.* at 11, 13). Finally, Plaintiff asserts the ALJ failed to address favorable evidence in making her finding of non-disability. (*Id.* at 7, 9-10, 12-13, 15).

The Commissioner contends substantial evidence supports the ALJ's finding that Claimant's impairments, singularly or in combination, did not meet or equal Listing 102.00. (Doc. 17, at 13-17). Further, he argues the ALJ properly evaluated all prior administrative findings, including articulating persuasiveness, consistency, and supportability. (*Id.* at 17-20). Finally, the Commissioner asserts the ALJ's findings regarding each of Claimant's limitations within each of the functional domains is supported by substantial evidence. (*Id.* at 20-27).

## IV. The Disability Standard and Standard of Review

The review of this case involves children's benefits. A child is considered disabled if he or she has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906; 42 U.S.C. § 1382c(a)(3)(C)(i).

In determining whether a minor child is disabled, the ALJ follows a three-step evaluation process. 20 C.F.R. § 416.924(a).

> The administrative law judge ("ALJ") must determine, in this order, (1) that the child is not engaged in substantial gainful activity, (2) that the child has an impairment or combination of impairments that is severe, and (3) that the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404.

*Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1237 (10th Cir. 2001) (citing 20 C.F.R. § 416.924(a)). In determining whether an impairment functionally equals the Listings, the ALJ must evaluate the child's functioning in each of six domains. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If the ALJ finds that the minor child has "marked" limitations in at least two of the six domains, or an "extreme" limitation in one of the domains, then the child's impairment(s) functionally equal the Listings, and the child is deemed disabled. *Id.* § 416.926a(a), (d).

This Court's review of the Commissioner's final decision is limited "to determin[ing] whether the Commissioner applied the correct legal standards and whether the agency's factual findings are supported by substantial evidence." *Noreja v. Comm'r, SSA*, 952 F.3d. 1172, 1177 (10th Cir. 2020) (citation omitted). "Substantial evidence is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Staheli v. Comm'r, SSA*, 84 F.4th 901, 905 (10th Cir. 2023) (quoting *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010)); *see also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (defining substantial evidence as "more than a scintilla, but less than a preponderance"). A court's review is based on the administrative record, and a court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (internal quotation marks omitted). Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002). But "an agency decision that either applies an incorrect legal standard or is unsupported by substantial evidence is subject to reversal." *Staheli*, 84 F.4th at 905.

**V.     The ALJ Did Not Adequately Consider the Evidence of Record, And Did Not Explain Why She Chose To Reject Significantly Probative Evidence.**

Plaintiff contends the ALJ failed to consider all the evidence of record, including but not limited to, in her evaluation of medical and non-medical source opinions. It is well established that an ALJ must demonstrate that she "considered all of the evidence" and must discuss not only the evidence supporting her decision, but also "the uncontroverted

5

evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). While the ALJ need not discuss every piece of evidence in the record, he also may not "mischaracterize or downplay evidence to support [his] findings," *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 640-41 (10th Cir. 2018). Additionally, the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Carpenter v. Astrue,* 537 F.3d 1264, 1265 (10th Cir. 2008).

Here, the support for the ALJ's findings as to Claimant's limitations in the six functional domains is insufficient because the ALJ failed to demonstrate that she considered all the record evidence and she failed to explain why she chose to reject significantly probative evidence. The ALJ's selectivity of evidence of non-disablity is apparent in the ALJ's discussion of the general record, opinion evidence, Plaintiff's subjective reports, and her specific findings within the six functional domains.

**A.     General Record**

In July 2020, Dr. Sarah A. Rhoades-Kerswill conducted an assessment of Claimant regarding problematic behavior, including meltdowns, aggressive behavior, "and the potential for a psychological disorder to be the root cause" of the same, as well as concerns related to learning, speech, and language. (AR, at 766-67, 773).[2] Following this assessment, Dr. Rhoades-Kerswill concluded that based on a broad checklist of child behavior, Claimant exhibited "no clinically significant concerns." (*Id.* at 771). The ALJ

---

[2] The behavioral assessment was conducted via Zoom due to the COVID-19 pandemic. (*Id.* at 766).

referenced this portion of Dr. Rhoades-Kerswill's assessment, (*id.* at 21), but failed to note that she found an "at-risk" level of concern regarding Claimant's hyperactivity and aggression and recommended "that [Claimant] receive a comprehensive evaluation that examines her cognitive, academic achievement, and adaptive skills." (*Id.* at 771-72). She could not complete the comprehensive evaluation at that time due to COVID-19. (*Id.* at 772).[3]

On March 1, 2021, Claimant underwent cognitive and achievement testing while in her initial first grade year. (*Id.* at 1223-34).[4] As the ALJ explained in her decision, the evaluator concluded that Claimant's overall intellectual ability was in the low range in comparison to others her age. (*Id.* at 22, 1223). The evaluator recommended reading instruction in the early kindergarten range, math instruction in the middle to late kindergarten range, and writing instruction in the early to middle kindergarten range. (*Id.* at 22, 1224).

The ALJ did not discuss the evaluator's determinations that Claimant would probably find it difficult, very difficult, or extremely difficult to succeed on thirty-one broadly categorized grade-level tasks. (*Id.* at 1229-34).[5] The evaluator also explained that

---

[3] In May 2022, Claimant's pediatrician, Dr. Tangra L. Broge, recommended this comprehensive evaluation be completed. (*Id.* at 1239).

[4] Claimant later repeated first grade in the 2021-2022 school year.

[5] These tasks included fluid and crystallized cognitive abilities, verbal knowledge and comprehension tasks, reasoning and concept formation, attending to and manipulating information in working memory, storage and retrieval of information, cognitive efficiency, oral vocabulary tasks, sequencing and pattern recognition tasks, phonologically mediated word access tasks, story listening and retelling tasks, visual-spatial tasks, tasks requiring verbal expression of general knowledge, rule-based categorization, working memory

Claimant would find it virtually impossible to succeed on another ten grade-level tasks. (*Id.* at 1230, 1232, 1233, 1234).[6]

In late March 2021, Tara Bailey, a Registered Occupational Therapist, administered an Occupational Therapy Evaluation on Claimant. (*Id.* at 1235-40). The ALJ only referenced this assessment when discounting teacher opinions and finding less than a marked limitation in the relevant functional domains. (*Id.* at 24, 25, 26, 27, 29, 30). Specifically, she repeatedly relied upon Ms. Bailey's notations that Claimant tolerated 25-30 minutes of time in her seat and did not need cues to remain on task. (*Id.* at 24, 25, 26, 27, 1235). She did not discuss the remainder of the assessment in which Claimant was unable to write her last name, omitted the letter U when reciting the alphabet, and left out nine letters in writing the alphabet. (*Id.* at 1237). Nor did the ALJ discuss Ms. Bailey's conclusion that Claimant's visual-motor integration was below average, equivalent to a child of five years and six months old, and her visual perception was low, equivalent to a child of four years and four months. (*Id.* at 1238). She recommended twenty-five school

---

capacity tasks, paired-associate learning, storage, and retrieval, math tasks, problem solving, number facility, automaticity, and reasoning, computational skills and fluency with basic math facts, writing tasks, spelling of single word responses, fluency of production, and quality of written expression, effective and fluent production of written sentences, math story problem tasks, spelling tasks, reading passage comprehension, math calculation, the ability to convey ideas in writing, word attack, basic arithmetic operations, and an ability to rapidly create and write short sentences. (*Id.*)

[6] These tasks included recognizing discrimination among letter patterns, word identification, reading speed, comprehension of written text, accurate word decoding skills, and fluent reading, as well as tasks involving grade-level reading, word identification, oral reading, and sentence reading speed and comprehension.

based occupational therapy services at 30-minutes each, which Claimant began receiving as part of an Individual Education Plan ("IEP"). (*Id.* at 1239-40).

In March 2022, Claimant was placed on another IEP. (*Id.* at 1241-57). The IEP objectives included Claimant being able to write her last name, write the alphabet, and demonstrate primitive reflex integration. (*Id.* at 1251). She attended special education each school day, in addition to working with an occupational therapist twenty-five times during the school year. (*Id.*). The ALJ stated that Claimant was only provided Special Education for reading but did not consider that she was also provided accommodations for reading, spelling, and English/language arts, including but not limited to one to two step instructions, extra time for written and oral responses, reduced length examinations, lower grade alternative reading material in subject areas, and frequent breaks during a test session. (*Id.* at 1252-53). The IEP plan noted that even with the use of supplementary aids and services, Claimant would not be successful in the school setting without an IEP due to her academic and cognitive deficits. (*Id.* at 1254).

### B.     Opinion Evidence

The discrepancies between the record as a whole and the evidence the ALJ considered in her decision are also evident when reviewing the ALJ's consideration of the opinion evidence. As an initial matter, Plaintiff criticizes the ALJ for analyzing the persuasiveness of Claimant's teachers' opinions. (Doc. 11, at 6). In support of Claimant's disability application, Plaintiff offered SSA Teacher Questionnaires completed by four teachers who previously taught Claimant in their classrooms. (AR, at 219-26, 270-77, 280-87, 736-43). The questionnaires contain the teachers' observations and opinions regarding

Claimant's abilities in various categories of functioning within the six functional domains relevant to Claimant's disability request. (*Id.*)

The Social Security Regulations provide that the evidence a plaintiff presents in support of her application may include information provided by a non-medical source. 20 C.F.R. §§ 416.912(a)(1), 416.913(a)(4). Further, these non-medical sources include "[e]ducational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers[.]" Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939, at *2. The Ruling specifically addresses the explanation required of the ALJ with regard to the opinions of other sources such as Claimant's teachers:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "[non-medical] sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at *6.

Claimant's teachers' opinions undoubtedly affect the outcome of this case. While SSR–06–03p does not require the ALJ to explain how "persuasive" she considers the teachers' opinions, certainly she may do so. Further, she must provide an explanation of a teacher's opinion that clearly discloses her reasoning with regard to her ultimate consideration of the same. *Id.*

Beginning with the questionnaire from Abigail Blackburn, Claimant's special education teacher, the ALJ explained:

10

> [Ms.] Blackburn opined the claimant had a serious problem knowing when to ask for help, using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation, and with expressing ideas in written form. Ms. Blackburn also opined the claimant had a very serious problem with completing assignments and with providing organized oral explanations [and] descriptions.

*(*AR, at 24). The ALJ then indicated she found this opinion "less persuasive" because it was inconsistent with Ms. Blackburn's other findings. (*Id.*) Specifically, she relied upon Ms. Blackburn's indications that Claimant had only a slight problem understanding math problems, carrying out multi-step instructions, and taking turns in conversation, and no problems following class rules, waiting to take turns, and following single-step instructions. (*Id.*)

The correlation between understanding math problems or taking turns and using adequate vocabulary and grammar, completing assignments, or communicating oral explanations is unclear. Conversely, Ms. Blackburn's opinion that Claimant had a serious problem understanding school and content vocabulary, expressing ideas in written form, and recalling and applying previously learned material, (*id*. at 271), is directly relevant to Claimant's ability to acquire and use information.

The ALJ also found the opinion of Claimant's original first grade teacher, Sue Sanders, that "[C]laimant had obvious problems in attending and completing tasks and serious or very serious problems in acquiring and using information," (*id*. at 24), to be "less persuasive." (*Id.* at 24). The ALJ found her opinion less persuasive based on her statement that although Claimant had an excessive number of absences the previous year, that factor had improved in first grade. (*Id.* at 24, 219).

11

In spite of having fewer absences, Ms. Sanders specifically stated that Claimant's instructional level in reading, math, and written language was pre-kindergarten, (*id.* at 219), and that she had serious or very serious problems in all ten skills related to the domain of acquiring and using information, (*id.* at 220). Ms. Sanders specifically wrote, "[Claimant] cannot do anything on a first-grade level. Teachers have asked her mother to retain her in [kindergarten] and Pre k[indergarten] but she would not agree. Her teacher has to give her extra help on everything or have peer tutoring. She is very far behind." (*Id.*) Also not considered by the ALJ, with regard to skills related to interacting with and relating to others, Ms. Sanders indicated that on a daily basis, Claimant had an obvious problem with relating experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, takin turns in conversation, and using adequate vocabulary and grammar to express herself. (*Id.* at 222).

Sara Haight, Claimant's teacher during her second year of first grade, also completed a questionnaire. (*Id.* at 280-87). The ALJ found her opinion persuasive. (*Id.* at 24). In rating the skills for acquiring and using information, she indicated Claimant did not experience more than a slight problem. (*Id.* at 281). In the written portion of the questionnaire, she explained that Claimant benefits from her IEP and getting extra 1:1 help with her work. (*Id.*) She also indicated Claimant has only slight problems in most skills

12

related to attending and completing tasks, although she has an obvious problem completing assignments. (*Id.* at 282).[7]

In her most recent Evaluation Form, Plaintiff's pediatrician, Dr. Broge, indicated Claimant experienced marked limitations in her ability to acquire and use information, attending and completing tasks, and interacting and relating with others. (*Id.* at 1327-28). The ALJ found Dr. Broge's opinion "unpersuasive" because it was allegedly "not supported by [her] own findings." (*Id.* at 25). The inconsistency upon which the ALJ relied was Dr. Broge's notation that Claimant's school was not certain she needed an IEP. (*Id.* at 25, 1339). The school's opinion is not Dr. Broge's "own findings." It is also notable that while Dr. Broge made a vague reference to Claimant's "school" considering an IEP unnecessary, both teachers who taught Claimant after the IEP implementation stated that she greatly benefitted from the same. (*Id.* at 226, 281).

### C.    Subjective Reports

In considering Plaintiff's subjective reports regarding Claimant's behavior, the ALJ limited her discussion significantly. The ALJ acknowledged Plaintiff's reports that Claimant was aggressive with siblings, locked the family out of their house, tossed clothes out of drawers, and exhibited tantrums, meltdowns, and fear of bath time. (*Id.* at 21, 23). She also noted Plaintiff's reports that Claimant had attention difficulties and potentially

---

[7] Plaintiff also submitted a questionnaire from Christy Briscoe, Claimant's kindergarten teacher, (*id.* at 736-43), which the ALJ found "less persuasive." (*Id.* at 23). In spite of this assessment, the ALJ relied on this opinion frequently in evaluating Claimant's limitations in the functional domains. Thus, the Court addresses the ALJ's consideration of Ms. Briscoe's opinion in the subsection below addressing the ALJ's functional domain analysis.

defiant behavior. (*Id.* at 21). The ALJ essentially discounted these reports because Claimant's behavior at school and/or during therapy sessions was not as severe. (*Id.* at 23).

Plaintiff's reports both during her testimony and throughout are consistent and more serious than the ALJ described. In January 2020, Plaintiff reported that Claimant was exhibiting behavioral challenges and temper tantrums going to school, though her behavior at school was not problematic. (*Id.* at 1136). She explained that at other times, Claimant pulled out her own hair when she got frustrated, threatened to hurt Plaintiff when she was upset, and threatened her younger brother with a knife. (*Id.* at 98, 1136). In July 2020, Plaintiff reported that Claimant exhibited anxiety frequently, especially if she was in a situation in which she did not have a choice, experienced a change in her routine, and/or was separated from her mother. (*Id.* at 769). For example, Claimant could only fall asleep if Plaintiff was present. (*Id.*) When Claimant's grandmother, instead of Plaintiff, was driving her to school, Claimant threw a tantrum for 25 minutes in the driveway and threatened to break her grandmother's bones. (*Id.* at 53-55, 760, 769-70). Additionally, for the entire year of pre-kindergarten and one-third of the kindergarten school year, Claimant cried every morning when Plaintiff dropped her off at school. (*Id.* at 769). Plaintiff did note that Claimant's tantrums had decreased recently, though that was due to having a stable routine at home after school closed due to COVID-19. (*Id.* at 770).

While discussing Claimant's extreme morning tantrums, Plaintiff testified that Claimant "does not seem to understand that you need to clothe yourself, you need to brush your teeth, you need to brush your hair, wash your hair." (*Id.* at 53). The ALJ characterized Plaintiff's testimony as having to remind Claimant to dress or wash her hair. (*Id.* at 23).

However, in comparing her testimony with the remainder of the record, it is apparent that Plaintiff's testimony was referencing having to perform these acts for Claimant each morning, rather than simply reminding her to do so. (*Id.* at 53, 769).

In August 2020, Alicia D. Baker, LPC, conducted a behavioral assessment on Claimant wherein Plaintiff made similar reports to those discussed above. (*Id.* at 756-63).[8] She also reported that although Claimant was six years old, she experienced nighttime enuresis and therefore slept in a diaper. (*Id.* at 758). Plaintiff further explained that Claimant threw frequent tantrums, screamed, yelled, and refused to cooperate with required behavior such as buckling a seat belt, if she did not get what she wanted. (*Id.* at 760, 763). She also stated that Claimant's behaviors resulted in frequent tardies at school. (*Id.*). Further supporting Plaintiff's subjective reports, in May 2021, after a series of appointments for Parent and Child Interactive Therapy, the therapist noted concern that while Claimant had shown tremendous progress, her behavioral score on the Eyberg Child Behavior Inventory remained "above 100." (*Id.* at 1220).

### D. Functional Domains

In her findings within the functional domains relevant to Claimant's application, the ALJ's discussion was equally as selective. For example, in finding Claimant had a less than marked limitation in her ability to use and acquire information, the ALJ relied on Ms. Briscoe's statement in her teacher questionnaire that Claimant worked to get tasks done. (*Id.* at 26). Although Ms. Briscoe did include this statement, she also specifically wrote,

---

[8] This behavioral assessment was also conducted via Zoom due to the COVID-19 pandemic. (*Id.* at 756).

15

"[Claimant] requires one-on-one[] help with most classroom activities at this point." (*Id.* at 737).

The ALJ also discounted Ms. Briscoe's opinion that Claimant "had . . . serious and very serious problems in acquiring and using information," (*id.* at 23), based on her purported statement that Claimant was only behind in school due to excessive absences. (*Id.* at 23, 26). Ms. Briscoe's full statement was that Claimant missed school due to doctor appointments and excessive tardies. (*Id.* at 736, 737). As to the latter issue, the ALJ consistently failed to acknowledge that Claimant's tardies were directly related to her behavioral problems. (*Id.* at 55, 760, 763, 1222). Moreover, the following year, Claimant's initial first grade teacher noted that even when Claimant did not have excessive absences, she was still not at grade level and had serious and very serious problems in all ten categories within this domain. (*Id.* at 219-20). Additionally, Claimant's special education teacher also found Claimant had serious to very serious problems in several categories related to acquiring and using information. (*Id.* at 271).

In finding a less than marked limitation in the domain of attending and completing tasks, the ALJ explained that in an August 2020 mental status examination, Claimant was focused and had goal directed thought processes and logical and consistent thought content. (*Id.* at 27). She noted that during a March 2021 therapy session, Claimant complied with demands and during a May 2021 psychology evaluation with Dr. Rachelle Floyd, Claimant was fully engaged throughout, only interrupting the examiner once. (*Id.*) The ALJ did not mention Dr. Floyd's further notations that also during the examination, Claimant was lying on the floor with her feet in the air or sitting on the arm rests of chairs. (*Id.* at 1193-94).

16

Nor did she discuss Dr. Floyd's conclusion that "[g]iven the amount of hyperactivity displayed during this evaluation, it is also recommended that [Claimant] be evaluated for Attention-Deficit/Hyperactivity Disorder." (*Id.*)

Also within this domain, the ALJ again relied on Ms. Briscoe's statement that Claimant worked to get tasks done. (*Id.* at 27). He failed to reference the remainder of Ms. Briscoe's response, in which she stated,

> [Claimant] is very sweet and works to get tasks done but requires a lot of help and at this time does not do well independently on most tasks. Because she has not learned her letters and sounds, it makes reading activities very difficult or even impossible at this time.

(*Id.* at 738).

Additionally, the record is replete with references from Claimant's additional teachers that she struggled to complete tasks. Claimant's teachers, including Ms. Briscoe, noted Claimant had obvious, serious, or very serious problems occurring on a daily basis in several categories related to attending and completing tasks. (*Id.* at 220, 272, 282, 738). One teacher remarked, "Child needs help with everything." (*Id.* at 221). Another stated, "She struggles with completing tasks and generally has missing homework assignments." (*Id.* at 271). The ALJ did not discuss this evidence in her decision.

The substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision. *Himmelreich v. Barnhart,* 299 F. Supp. 2d 1164, 1167 (D. Colo. 2004). Reviewing the decision along with the entirety of the evidence in this case, the court is unable to determine whether the ALJ considered the entire record or whether she merely focused on the portions of the evidence that supported

her decision. An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for her conclusions regarding the evidence. *Bryant,* 752 F. App'x at 640. The ALJ must explain why she rejects significantly probative evidence. *Clifton*, 79 F.3d at 1009-10. There is much evidence that conflicts with the ALJ's findings and those findings must be resolved by the Commissioner upon remand of this case. For these reasons, the court finds that the ALJ's decision is not supported by substantial evidence.

## VI.     The Court Declines to Address Plaintiff's Remaining Allegations.

Because remand is warranted based on the above issues alone, the undersigned need not address Plaintiff's other claims of error. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

**ORDER**

The court has reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties. Based on the forgoing analysis, the court **REVERSES AND REMANDS** the Commissioner's decision. On remand, the ALJ shall fully consider and sufficiently discuss all the significantly probative medical, non-medical, and opinion evidence of record, and whether and why it is accepted or rejected, in order to permit a subsequent reviewing court to follow the ALJ's reasoning.

**SO ORDERED** this 27th day of March, 2024.

AMANDA MAXFIELD GREEN
UNITED STATES MAGISTRATE JUDGE